1
2
3
4
5                    UNITED STATES DISTRICT COURT

6               FOR THE EASTERN DISTRICT OF CALIFORNIA

7

8   LYNN MARIE MCCARTY and LARRY DALE        1:10-CV-00350 OWW-DLB
    MCCARTY,
9                                            MEMORANDUM DECISION RE
               Plaintiffs,                   PLAINTIFFS' MOTION TO AMEND
10                                           COMPLAINT TO JOIN DEFENDANT
                                             AND REMAND TO STATE COURT
11        v.                                 (DOC. 7.)

12  JOHNSON & JOHNSON, DePUY, INC., DePUY
    ORTHOPAEDICS, INC., STEVE WHITEFIELD
13  and DOES 1 through 100.

14             Defendants.

15                        I. <u>INTRODUCTION</u>

16       Before the court is Plaintiff's motion to remand for lack of

17  subject matter jurisdiction under 28 U.S.C. § 1447(c) and to

18  amend to join San Joaquin Valley Orthopaedics Inc. ("SJVOI") as a

19  defendant under 28 U.S.C. § 1447(e).  Plaintiffs, as citizens of

20  California, claim the joinder of Defendant Steve Whitefield

21  and/or the joinder by amendment of SJVOI, both California

22  citizens, defeat complete diversity of citizenship required under

23  28 U.S.C. § 1332.  Defendants oppose, asserting Mr. Whitefield is

24  a "sham" defendant and there is no valid cause of action against

25  him.  Defendants also oppose amendment, arguing it is not

26  possible to state a valid cause of action against SJVOI.

27

28
                                 1

## II. BACKGROUND

This is a California state law product liability action concerning the malfunction of an orthopaedic implant.  On July 26, 2006, a prosthetic femoral rod was implanted in Plaintiff, Lynn Marie McCarty, during surgery at Saint Agnes Hospital in Fresno.  (Compl. ¶ 1.)  In March 2008, Plaintiff felt pain in her hip.  A subsequent x-ray revealed a fracture of the femoral rod. (*Id.*)

On December 15, 2009, Plaintiffs filed an action in state court against Johnson & Johnson, DePuy, Inc., DePuy Orthopaedics, Inc., and Steve Whitefield.  (*Id.*)  Johnson & Johnson is alleged to be "a corporation that designs, manufactures, sells and/or distributes the Femoral Rod that was implanted in Plaintiff . . . ."  (Compl. ¶ 17.)  DePuy, Inc., and DePuy Orthopaedics are divisions of Johnson & Johnson engaged in the business of "licensing, designing, manufacturing, distributing and/or selling, either directly or indirectly, through third parties or related entities the Femoral Rod."  (Compl. ¶¶ 18-19.)  Steve Whitfield is alleged to be an individual who "regularly conducted and continues to conduct on behalf of Johnson & Johnson and/or DePuy Orthopaedics, Inc. distribution and sales of the Femoral Rod."  (Compl. ¶ 20.)

The complaint alleges ten theories of damages, including forms of strict liability, negligence, breach of warranty, and

2

loss of consortium.  (Compl. ¶ 22-70.)

Plaintiffs assert strict liability, breach of implied warranty, and negligent misrepresentation against Whitefield. (Doc. 7-1.)  Plaintiffs claim that Mr. Whitefield was a "chain in the link" of the product's distribution and thus should be held liable under California's "stream of commerce" strict liability doctrine.  (*Id.*)  Plaintiffs also contend that, as a sales representative, Mr. Whitefield is liable for a violation of implied warranty he made as part of the sale.  (*Id.*)  Lastly Plaintiffs assert Mr. Whitefield made negligent representations regarding the success of the prosthesis.  (*Id.*)

On February 26, 2010, Defendants removed to the United Stated District Court, Eastern District of California.  (Doc. 8-1.)  Defendants maintain that there is complete diversity of citizenship because Steve Whitefield is fraudulently joined as a "sham" defendant.  (*Id.*)

On March 26, 2010, Plaintiffs moved to remand and to amend the complaint.  (Doc. 7-1.)  Plaintiffs maintain Steve Whitefield was not fraudulently joined.  (*Id.*)  Plaintiff filed supporting declarations of Lynn Marie McCarty, Robert A. Abel, Jr., and Malcolm E. Gharzal, M.D.  (Docs. 7-8 through 7-11.)

On May 28, 2010, Defendants opposed the motion and filed the supporting and supplemental declarations of Steve Whitefield. (Docs. 7-5 and 8-2.)  Defendants acknowledge both SJVOI and Steve

3

Whitefield are California residents.

Defendants maintain that Plaintiffs cannot state a valid cause of action against Mr. Whitefield because: (1) a sales representative cannot be held strictly liable under the stream of commerce theory (*id.*); (2) a claim for breach of the implied warranty cannot be maintained because there was no privity between Mr. Whitefield and Plaintiffs (*id.*); and (3) Mr. Whitefield did not make any representations to Mrs. McCarty and any evidence she offers of alleged misrepresentations made to others is inadmissible hearsay (*id.*).  Defendants also argue that it would be futile to add SJVOI as a defendant because claims against SJVOI would fail for the same reasons claims against Steve Whitefield would fail.  (*Id.*)

### III. <u>STANDARDS OF DECISION</u>

United States Courts have jurisdiction over civil cases if the amount in controversy exceeds $75,000 and there is complete diversity of state citizenship.  28 U.S.C. § 1332.  Diversity is required between all plaintiff and defendants.  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005).  There is a presumption against removal jurisdiction in order to protect the jurisdiction of state courts.  *Harris v. Bankers Life and Gas, Co.*, 425 F.3d 689, 698 (9th Cir. 2005) (citing *Shamrock Oil & Gas Copr v. Sheets*, 313 U.S. 100, 108-09, (1941)).  "Th[is] 'strong presumption' against removal jurisdiction means that the

4

defendant always has the burden of establishing that removal is proper." *Gaus v. Miles*, 980 F.2d 564, 566 (9th Cir. 1992).

Fraudulent joinder is an exception to the diversity requirement. A "sham" defendant or fraudulent joinder occurs "if the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state." *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001).

A party is fraudulently joined if, "after all the disputed questions of fact and all ambiguities in the controlling state law are resolved in the plaintiffs favor, the plaintiff could not possibly recover against the party whose joinder is questioned." *Kruso v. Int'l Tel. & Tel. Corp.*, 872 F.2d 1416, 1426 (9th Cir. 1989).

Courts may "pierce the pleadings" in order to determine if a party is fraudulently joined. *Maffei v. Allstate California Ins. Co.*, 412 F. Supp. 2d 1049, 1053 (E.D. Cal. 2006). "The defendant seeking removal to the federal court is entitled to present the facts showing the joinder to be fraudulent." *McCabe v. General Foods Corp.*, 811 F.2d 1336 (9th Cir. 1987). A court may "consider summary judgment-type evidence such as affidavits and deposition testimony." *Morris*, 236 F.3d at 1068, (citing *Cavallini v. State Farm Mutual Auto Ins. Co.*, 44 F.3d 256, 263 (5th Cir. 1995)). The plaintiff needs only one possibly valid claim against a non-

diverse defendant in order to defeat an assertion of fraudulent

joinder.  *Richey v. Upjohn Drug Co.*, 139 F.3d 1313 (9th Cir.

1998).

### IV. <u>ANALYSIS</u>

     Plaintiffs claim they have a possibility of recovering

against Mr. Whitefield under (1) strict liability, (2) implied

warranty, and (3) negligent representation.

### (1)  <u>Strict Liability.</u>

     Plaintiffs claim they can recover against Mr. Whitefield

under California's stream of commerce strict liability doctrine,

pursuant to which strict liability applies "downward through the

various links in the marketing chain from manufacturer to

distributor, to retailer, and so forth."  *Kasel v. Remington Arms

Company, Inc.*, 24 Cal. App. 3d 711, 724 (1972).

     Strict liability developed from policy interests including

enhancing product safety, maximizing protection to the injured

plaintiff, and apportioning costs among the defendants.  *Altman

v. HO Sports Co., Inc.*, 2009 WL 2590425, at *3 (E.D. Cal. 2009).

"Where these policy justifications are not applicable, the courts

have refused to hold the defendant strictly liable even if that

defendant could technically be viewed as a 'link in the chain' in

getting the product to the consumer market."  *Id.* (citing *Arriaga

v. Citi-Capital Commercial Corp.*, 167 Cal. App. 4th 1527, 1535

(2008)).

6

1         A distributor can be held strictly liable for products sold.

2   *Vandermark v. Ford Motor Co.,* 61 Cal. 2d 256, 262 (1964).  In

3   *Vandermark* the court held that a retailer could held liable as a

4   distributor under stream of commerce strict liability.  *Id*.  The

5   court reasoned that the policy concerns for manufacturers applied

6   to retailers.  *Id*.  "The courts have since applied the doctrine

7   to others similarly involved in the vertical distribution of

8   consumer goods, including lessors of personal property,

9   developers of mass-produced homes, wholesale and retail

10  distributors, and licensors."  *Bay Summit Community Ass'n v.*

11  *Shell Oil Co.*, 51 Cal. App. 4th 762, 773 (1996) (citing cases).

12        A sales company can be a distributor.  In *Hinds*, the court

13  refused to dismiss a strict liability claim against a sales

14  company that facilitated an order between a hospital and larger

15  corporation.  *Hinds v. Zimmer*, Inc., 2009 WL 1517893 (E.D. Cal.

16  June 1, 2006).  The court found that the sales company was a

17  distributor under California law and refused to recognize the

18  sales company as a "sham defendant."  *Id*.  Although *Hinds* does

19  not explicitly define who or what would qualify as a

20  "distributor," the corporate defendant in *Hinds* did not hold

21  title to the product and did not ship the products to the

22  hospital, but did send representatives to be present during

23  surgery.  *Id*.  *Hinds* held that the company placed the product

24  into the stream of commerce and qualified as a distributor.  *Id*.

7

Likewise, in *Becraft v. Ethicon*, 2000 WL 1721056 (N.D. Cal. Nov 2, 2000), a company that delivered contaminated sutures was a distributor and therefore not a "sham defendant."  *Id*.

However, *Altman* suggests an individual salesperson working directly for a manufacturer does not qualify as a distributor for purposes of the stream of commerce doctrine.  2009 WL 2590425. The salesperson in *Altman* was a direct employee of a company that manufactured wakeboarding boots.  *Id*. at *3.  *Altman* reasoned that the policy implications for strict liability did not apply to the individual sales person.  *Id*. ("[A]s a sales employee of the product manufacturer, the Court does not see how the policies underlying strict products liability (enhancing product safety, maximizing protection to the injured plaintiff, and apportioning costs among the defendants) would be furthered by applying the doctrine to [the salesperson]".).

Possessing legal title to the product is not an element of distribution.  In *Arriaga*, 2008 WL 2212978, the court held that, even though it possessed legal title to the product, a financing company was "outside the direct chain of distribution," and could not possibly be held strictly liable.  Furthermore in *Hinds*, no mention of legal title is made.  *Hinds*, 2009 WL 1517893.

Defendants rely on *Bay Summit Community Ass'n,* 51 Cal. App. 4th 762, to define the limitations on strict liability.  In *Bay Summit*, Shell Oil Company provided resin that was used to create

8

a defective polybutylene plumbing system.  *Id.*  Shell helped

market the plumbing product and played an integral role in

bringing the product to the consumer market.  *Id.*  *Bay Summit*

relied on *Kasel* to articulate a three part test that limits the

scope of Strict Liability:

> (1) [T]he defendant received a direct financial benefit
> from its activities and from the sale of the product;
> (2) the defendant's role was integral to the business
> enterprise such that the defendant's conduct was a
> necessary factor in bringing the product to the initial
> consumer market; and (3) the defendant had control
> over, or a substantial ability to influence, the
> manufacturing or distribution process.

*Id.* at 776 (citing *Kasel,* 24 Cal. App. 3d. 711).  This test,

however, applied to participants <u>outside</u> the chain of

distribution.  Shell did not distribute, manufacture, sell, or

participate in the chain of distribution.  *See Arriaga v. Citi-*

*Capital Commercial Corp.*, 167 Cal. App. 4th 1527 at *21 (2008)

(explaining that the three-part test in *Bay Summit* applies to

entities involved in the marketing process but outside the

vertical distribution chain).  Elsewhere, *Bay Summit* quotes other

portions of *Kasel* to affirm that control is not always necessary.

> Thus strict liability may attach even if the defendant
> did not have actual possession of the defective product
> or control over the manner in which the product was
> designed or manufactured.

*Bay Summit*, 51 Cal. App. 4th 778 (citing *Kasel,* 24 Cal. App. 3d.

711).

9

1

                     (a)   <u>Does Mr. Whitefield qualify as a distributor</u>

2
                            <u>for purposes of the streams of commerce</u>
                            <u>theory?</u>

3

4
     Plaintiffs allege that Mr. Whitefield participated in the sale and distribution of the prosthesis.  (Compl. ¶ 20.)

5

6
According to Dr. Ghazal's declaration, "Steve Whitefield was present at many of the surgeries that I conducted in which

7

8
[Ghazal] utilized medical products that were sold by Steve Whitefield."  (Doc. 7-11 ¶ 6 [Decl. of Dr. Ghazal]).  "It was Mr.

9

10
Whitefield's custom and practice at my surgeries that he did attend to bring the medical product into the operating room."

11

12
(*Id.*)

13
     Whitefield counters in his declaration that "He did not

14
deliver the prosthesis to the hospital for the surgery."  (Doc.

15
7-5 ¶ 5 [Decl. of Steve Whitefield]).  St. Agnes Medical Center

16
kept a supply of prosthetic components and the "hospital staff

17
was responsible for delivery of the component." (Doc. 8-2 ¶ 5

18
[Supplemental Decl. of Steve Whitefield]).  Whitefield attended

19
the surgery to make sure the "instruments and implants

20
potentially needed for the surgery were present and available."

21
(Doc. 8-2 ¶ 3.)  Whitefield claims to not have any "contractual

22

23
relationship" with Johnson & Johnson or Depuy.  (Doc. 7-5 ¶ 2.)

24
Whitefield also never took title of the property.  (Doc. 7-5 ¶

25
4.)  The property transferred from Depuy to St. Agnes.

26
     For the purposes of the fraudulent joinder analysis, this

27
conflicting evidence must be viewed in the light most favorable

28

10

to Plaintiffs.  *See McKee v. Kansas City Southern Ry. Co.*, 358

F.3d 329, 334 (5th Cir. 2004).  In this light, Mr. Whitefield

possibly qualifies as a distributor.  Unlike in *Altman*, 2009 WL

2590425, which held that an individual salesman working directly

for the manufacturer was not a "distributor" for purposes of the

stream of commerce doctrine, Whitefield worked for a separate

sales company.  Also, Mr. Whitefield attended the surgery, which

is analogous to the presence of the corporate distributor

defendant's representative at the surgery in *Hinds*.  *See* 2009 WL

1517893, at *1.  He says he was there to see the products needed

for surgery were present and available.

     It is of no moment that Mr. Whitefield's employer SJVOC and

Mr. Whitefield did not hold title to the product.  *See Arriaga*,

167 Cal. App. 4th 1527.

     The policy rationale for strict liability applies with

greater force to Mr. Whitefield than it did to the salesperson in

*Altman*.  In *Altman*, the manufacturer was already named as a

defendant.  Consequently, little would have been gained in terms

of product safety, maximizing protection to the injured

plaintiff, and apportioning costs among the defendants, by naming

an individual sales employee of the manufacturer.  Here, however,

Mr. Whitefield was named to represent a separate source in the

stream of commerce, that of the distributor.  Mr. Whitefield is

principal in his own company and a separate party who profited

11

from the sale.

Unlike the defendant in *Bay Summit*, which limited the reach of strict liability to those outside of the chain of distribution, whether Mr. Whitefield is a part of the direct chain of distribution is materially in dispute.  All that is required for purposes of disproving fraudulent joinder is a possibly valid claim.  *Richey*, 139 F.3d at 1313.  There is one here.  It is more appropriate to permit the state court to make determinations as to the scope and reach of California's strict liability doctrine.  *See Spataro v. Depuy Orthopaedics, Inc.*, 2009 WL 382617 at * 8 (D.N.M. 2009).

Here, where Mr. Whitefield worked for a separate sales company and attended Plaintiff's surgery to assure presence of the product, it is possible that Plaintiffs can recover from him under the streams of commerce theory.  *See Hinds*, 2009 WL 15178893; *Bercraft*, 2000 WL 1721056.  The standard of review requires only a possibility of recovery.  Plaintiffs have met that burden.  Because Mr. Whitefield was not fraudulently joined, complete diversity does not exist. Plaintiffs' motion to remand is GRANTED.

> (b)   <u>Is SJVOI a distributor under the streams of commerce theory?</u>

Even if, *arguendo*, Mr. Whitefield should not be considered part of the stream of commerce under *Altman*, his employer, SJVOC, a California corporation, qualifies under *Hinds*.  Similar to

*Hinds*, viewing the uncontroverted allegations and evidence in a light most favorable to Plaintniffs, SJVOI is a sales company that facilitated sales of prosthetic devices between the hospital and the manufacturer.  2009 WL 15178893.  SJVOI's assertion that it is not a distributor is unsupported.  SJVOI profits from the sale of the product, facilitates the sale of the product, and even sends representatives to attend surgery, just as the sales company did in *Hinds*.

As discussed above, transfer of title is not a necessary component of "distribution" under the stream of commerce theory.

Plaintiffs have met their burden of establishing that it is possible for them to recover against SJVOI for strict liability.

Whether amendment is otherwise permissible is discussed below.

### (2)   Implied Warranty.

Plaintiffs implied warranty claim alleges that Defendant "sold and delivered" the femoral rod to the operating room (Compl. ¶ 51); and that the femoral rod was "warranted for its strength, stability, and durability" (Compl. ¶ 48-52).  Plaintiff makes no mention of privity.

California has implemented the Uniform Commercial Code's implied warranty provision.  Cal. Com. Code § 2315; Cal. Com. Code § 2314.  "The implied warranty of fitness requires that a buyer of goods rely upon the seller's skill or judgment to select

or furnish a suitable product." *Evreats v. Intermedics*

*Intraocular, Inc.*, 29 Cal. App. 4th 788 (1994).  "A warranty that

the goods shall be merchantable is implied in a contract for

their sale."  Cal. Com. Code § 2314.

Under California law, privity between parties is required

for either claim of implied warranty.  "Privity of contract is a

pre-requisite in California for recovery on a theory of breach of

implied warranties of fitness and merchantability."  *Blanco v.*

*Baxter Healthcare Corp.*, 158 Cal. App. 4th 1039, 1058 (2008).

"There is no privity between the original seller and a subsequent

purchaser who is in no way a party to the original sale."  *Burr*

*v. Sherwin Williams Co.*, 42 Cal. 2d 682, 695-96 (1954).  The one

exception to this requirement is for foodstuffs, which are not at

issue in this case.  *Evreats*, 29 Cal. App. 4th at 788.

Courts have held that a medical device sold by a hospital to

a patient does not create an implied warranty between outside

sellers or representatives.  In *Evreats*, a patient received a

defective intraocular lens that was implanted in the patient's

eye.  *Evreats*, 29 Cal. App. 4th at 788.  The patient claimed a

cause of action against the manufacturer.  *Id*.  *Evreats* held that

the patient could not sue the manufacturer or distributor of the

prosthetic, because there was not privity between the patient and

manufacturer.  *Id*.  "[Plaintiff] relied upon his physician's

skill or judgment to select or furnish a suitable product."  *Id*.

14

There is no privity between Whitefield and Plaintiff.  As in *Evreats*, the Femoral Rod was sold to the hospital and then chosen by the doctor.  Mr. Whitefield did not sell the product directly to Mrs. McCarty.  Like *Evreats*, Plaintiff relied on the advice of her doctor and the doctor chose the device.  Mrs. McCarty never met Mr. Whitefield and did not receive any representations from him.  There was no privity between Plaintiff and Mr. Whitefield, nor is there any suggestion that privity would exist between Plaintiffs and SJVOI.

Plaintiffs have no possibility of recovering against Mr. Whitefield or SJVOI on their implied warranty claim.  The claim is DISMIISED WITHOUT LEAVE TO AMEND.

### (3)   Negligent Misrepresentation.

Plaintiffs also allege that Mr. Whitefield negligently misrepresented the product.

The standard of review for a fraudulent joinder allows for Defendant to "pierce the pleadings" and apply an approach similar to summary judgment.  *Maffei*, 412 F. Supp. 2d 1049.  Defendant bears the burden of presenting evidence to prove that the joinder is fraudulent.  In order to rebut such a showing, Plaintiff must present admissible facts that suggest a possibility of recovery under the theory.   Affidavits, depositions, and declarations may be considered in establishing a possibility of the claim.  *Morris*, 236 F.3d at 1068.

1    In order to show a possibility of relief, Plaintiff must

2    provide **admissible** evidence that a cause of action is possible.

3    Under Federal Rules of Evidence Rule 402 "[h]earsay is not

4    admissible except as provided by these rules or by other rules

5    prescribed by the Supreme Court pursuant to statutory authority

6    or by Act of Congress."

7

8    Here Defendants have met their initial burden of presenting

9    evidence that undermines the validity of Plaintiffs' negligent

10   misrepresentation claim.  Steve Whitefield's declaration states

11   he "did not speak to or make any representation or warranties to

12   either Mr. Mccarty or Mrs. Mccarty prior to her surgery."  (Doc.

13   7-7.)  Whitefield's supplemental declaration confirms that he

14   made no statements about the appropriateness of the rod to Dr.

15   Ghazal. (Doc. 8-2)

16

17   In support of Plaintiffs' claim, Mrs. McCarty declares:

18   "Dr. Gazal specifically informed me that Steve Whitefield

19   represented to Dr. Ghazal that the subject femoral rod was a

20   proper and appropriate device for my particular surgery."  (Doc.

21   7-8.)  This is second layer hearsay and inadmissible because Dr.

22   Gazal has a motive to shift responsibility for the allegedly

23   defective rod, the McCarty declaration is inadmissible. However,

24   Dr. Gazal's declaration does not include any statements about

25   representations made by Steve Whitefield. (Doc. 7-11.)  Plaintiff

26   never met or talked to Defendant.  These alleged statements are

27

28
                                16

inadmissible hearsay.  Plaintiff offers no other evidence of misrepresentation.

Plaintiffs have not shown a possibility of recovery on this cause of action.  <u>It IS DISMISSED</u>

B.   <u>Amendment.</u>

In the event that Mr. Whitefield is found to be a sham defendant, Plaintiffs move to amend to join SJVOI.  As discussed above, it is possible that Plaintiffs could recover against SJVOI under a theory of strict liability.

A judge has discretion to allow or deny an amendment to add a party that destroys diversity.  "If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to state court."  28 U.S.C. § 1447(e).  Courts consider six factors when determining whether amendment should be granted:

> (1) Whether there are any valid claims;
>
> (2) If the party is required to be joined by rule 19 of the Federal Rules of Civil procedure;
>
> (3) Whether the statue of limitations precludes naming the party in state court;
>
> (4) Whether there was unexpected delay in joinder;
>
> (5) Whether joinder is only for defeating diversity jurisdiction; and

(6) Whether denial would prejudice plaintiff.

*IBC Aviation Services v. Companies Mexicanna de Aviation*, 125 F. Supp. 2d 1008 (N.D. Cal. 2000).

### (1)   Meritorious Claim.

A meritorious claim is an important factor in determining if an amendment should be granted.  *Clinco v. Roberts,* 41 F. Supp. 2d 1080 (C.D. Cal. 1999).  Many of the other factors rely on the results of a meritorious claim.

In this case as seen above, Plaintiffs can state a valid strict liability claim against SJVOI.

### (2)   Rule 19 Joinder.

"Federal Rules of Civil Procedure 19 requires joinder of persons whose absence would preclude the grant of complete relief, or whose absence would impede their ability to protect their interests or would subject any of the parties to the danger of inconsistent obligations."  *IBC* at 1011.  In general, Rule 19 is satisfied when joinder would prevent redundant litigation.  *IBC* held that forcing a plaintiff to litigate in two forums was a waste of judicial resources and risked inconsistent judgment.  *Id.*  Denying an amendment would force SJVOI to take separate action on the same facts and law relating to the current case.

When evaluated as part of the 28 U.S.C. § 1447(e) determination, a court also must examine whether the non-diverse defendant sought to be joined is "tangentially related to the

18

cause of action." *Id.* Here, SJVOI, a distributor of the product, is not "tangentially related" to the strict liability claim. It is in the direct chain of distribution. California law specifically subjects distributors to liability under the streams of commerce doctrine.

This factor favors amendment.

### (3) Motive.

"[T]he motive of a plaintiff in seeking the joinder of an additional defendant is relevant to a trial court's decision to grant the plaintiff leave to amend." *Desert Empire Bank v. Ins. Co. of N. America*, 623 F.2d 1371, 1376 (9th Cir. 1980). "[A] trial court should look with particular care at such motive in removal cases, when the presence of a new defendant will defeat the court's diversity jurisdiction and will require a remand to the state court." *Id.* In IBC, the court refused to "impute an improper motive to Plaintiff simply because Plaintiff seeks to add a non-diverse defendant post-removal." *IBC*, 125 F. Supp. 2d at 1012.

Defendant claims the amendment is motivated by destroying diversity. However, there is a potentially valid claim against SJVOI. Moreover, Plaintiff was not aware of the existence of SJVOI until after the removal. Amending to add a party previously unknown defendant that participated in the stream of commerce is reasonable under the circumstances.

19

(4)   Statute of Limitations.

The statute of limitations is also a factor in determining whether to permit amendment.  *Id.* at 1008.  The limitations period for a strict liability claim is three years.  Cal. Civ. Code § 338; *see also County of Santa Clara v. Atl. Richfield Co.*, 13 Cal. App. 4th 292, 301 (2006).  Here, Plaintiffs discovered the fracture in the Femoral Rod on March 31, 2008.  (Compl. ¶ 18.)  The three year limitations period does not expire until March 31, 2011.

(5)   Timeliness.

Timeliness is a factor in determining if the amendment should be granted.  Courts consider the status and time frame of the litigation, and whether there has been delay in seeking amendment.  *Id.*  In *IBC*, the court held that amendment was timely when discovery had not yet begun.  *Id.*

Plaintiff did not know of the existence of SJVOI until the removal.  (Doc. 9-1 [Pls.' Reply to Defs.' Opp'n to Pls.' Mot. To Remand And To Am.])  In this case "disclosures have not been exchanged, and the initial case management conference has not yet occurred."  (Id.)  Plaintiffs' amendment is timely.

(6)   Prejudice.

Prejudice to the plaintiff is also considered.  Prejudice exists if the proposed defendant is "crucial" to the case. *Newcombe v. Adolf Coors Co.,* 157 F.3d 686, 691 (9th Cir. 1998).

Prejudice does not exist if complete relief can be afforded without that defendant. *Id*. In *Newcombe*, prejudice was not found where the plaintiff sought an injunction and damages that could be fully satisfied by the other defendants. Here, the streams of commerce doctrine permits a strict liability claim against SJVOI. One of the purposes of strict liability is to apportion costs among the responsible defendants. So long as SJVOI is a potentially responsible party, Plaintiffs will be prejudiced in its absence.

Because Plaintiff meets all six factors, amendment to add SJVOI as a defendant is proper. The motion to amend is granted.

C.   Attorney's Fees and Costs.

Plaintiffs also seek compensation for attorney's fees incurred in conjunction with this motion to remand. Costs are permissible under 28 U.S.C. § 1447(c) but discretionary. "Congress has unambiguously left the award of fees to the discretion of the district court." *Moore v. Permanente Medical Group, Inc.*, 981 F.2d 443, 446 (9th Cir. 1992). Courts have remanded but not given fee's where a claim was arguable. *Wehr v. Pheley*, 2000 WL 236438 (N.D. Cal. Feb. 16, 2000). Here, the issue of fraudulent joinder was fairly debatable and Defendants' removal was not without foundation. Plaintiffs' request for fees and costs is DENIED.

V. <u>CONCLUSION</u>

For the reasons set forth above:

(1) Plaintiffs' motion to remand is GRANTED because Mr. Whitefield was not fraudulently joined to the strict liability claim.  Even if he were, Plaintiffs can state a claim against SJVOI for strict liability.

(2) Plaintiffs shall pursue amendment in the state court.

(3) Plaintiffs' request for attorney's fees and costs is DENIED.

(4) Plaintiffs shall submit a form of order consistent with this memorandum decision within five days of electronic service.

SO ORDERED

Dated:  June 28, 2010

<u>/s/ Oliver W. Wanger</u>
Oliver W. Wanger
United States District Judge

22